IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ADVANCE CAPITAL PARTNERS, LLC | : | CIVIL ACTION |
| and LIZA PRICE | | |
| | : | |
| v. | | |
| | : | |
| BELA ROSSMANN | | NO.  09-3467 |

## MEMORANDUM OF DECISION

THOMAS J. RUETER                                November 9, 2011
United States Magistrate Judge

Before the court for decision after a bench trial is an action filed by plaintiffs,

Advance Capital Partners, LLC and Liza Price, against defendant, Bela Rossmann, asserting

claims of breach of contract, breach of implied covenant of good faith and fair dealing,

fraudulent inducement, fraudulent concealment, breach of fiduciary duty, and negligent

misrepresentation.  See Complaint (Doc. No. 1).  The parties consented to trial before the

undersigned and the Honorable J. Curtis Joyner referred the trial to this court by order dated June

30, 2010 (Doc. No. 16).  Trial commenced on December 13, 2010 and testimony was heard

through December 14, 2010.  Closing arguments were presented on February 23, 2011, and each

party submitted proposed findings of fact and conclusions of law (Doc. Nos. 22, 24).  In

accordance with Fed. R. Civ. P. 52(a), the court makes the following Findings of Fact and

Conclusions of Law:

## I.      FINDINGS OF FACT

### A.      The Parties and the Property

Plaintiff Advance Capital Partners, LLC ("ACP") is a limited liability company

organized and existing under the laws of the State of New Jersey, with its principal place of

business in New Jersey.  Peter Cocoziello, at all times relevant hereto, was the Chief Executive Officer of ACP.  (N.T., 12/13/10, at 7-8.)  Mr. Cocoziello has been involved in the acquisition and development of real estate for commercial, residential and mixed use purposes for more than thirty years.  Id. at 9-10.  Plaintiff Liza Price ("Ms. Price" and with ACP, "plaintiffs") is an individual residing in New Jersey.  Defendant Bela Rossmann ("defendant") is an individual residing in Bucks County, Pennsylvania.  (Complaint ¶¶ 1-3; Answer ¶¶ 1-3.)  At issue in this action is a fifty-eight acre parcel of real property located on Buckmanville Road, in Upper Makefield Township, Bucks County, Pennsylvania (the "Property").  Mingdesty, Inc. ("Mingdesty") is an entity formed by defendant to hold title to the Property.  Until November 25, 2008, defendant was the sole shareholder of Mingdesty.  (Complaint ¶ 3; Answer ¶ 3.)

**B.      The Purchase of the Property**

On or about October 8, 2004, defendant and two partners (the two partners will be referred to herein as the "Former Partners") executed an agreement of sale to purchase the Property from Benita J. Ryan with settlement to take place on or before October 1, 2006.  (Ex. P-5.)  By letter dated September 7, 2006, defendant was notified of the approval of the final subdivision plan for the Property.  (Ex. P-6.)  Shortly thereafter, the Former Partners notified defendant that they would not go forward with the purchase of the Property and assigned their interests in the agreement of sale to defendant and Mingdesty in an Assignment Agreement dated September 27, 2006.  (Ex. P-4; N.T., 12/14/10, at 157-58.)  Ms. Ryan agreed to extend the closing date to November 1, 2006.  (Ex. P-5.)

National Penn Bank ("National Penn") was defendant's lender for the purchase of the Property.  National Penn lent defendant $3,100,000 (the "National Penn Loan").  (Ex. P-8.)

2

Defendant required one or more partners willing to make a loan of $1.1 million in order to meet the lending requirements of National Penn to close on the purchase of the Property.[1] Defendant called Ms. Price seeking names of potential investors.  Defendant was introduced to Ms. Price in 2000 by persons performing work on her farm.  (N.T., 12/13/10, at 164.)  Ms. Price met Mr. Cocoziello in 2001 through an organization called the Young President's Organization.  Id. at 11, 176.  Ms. Price introduced Mr. Cocoziello to defendant to discuss the Property.  Id. at 169-70.  On October 23, 2006, Ms. Price and Mr. Cocoziello met with defendant at Mr. Cocoziello's office for approximately thirty minutes.  Id. at 171.  At this meeting, defendant provided plaintiffs with a copy of the Buckmanville Road Project brochure.  (Ex. P-9; N.T., 12/13/10, at 171; N.T., 12/14/10, at 156.)

On October 29, 2006, Ms. Price, Mr. Cocoziello, his wife Sharon, and Tim Dillon[2] toured the Property with defendant for approximately forty-five minutes.  During the tour, defendant explained that the Property was to be divided into two lots, a fourteen acre lot and a forty-four acre lot.  (Complaint ¶ 10; Answer ¶ 10.)  Defendant stated that he had interested buyers for the fourteen acre lot.  Defendant wanted to close quickly on the purchase of the Property so that he could make the sale of the smaller lot.  (N.T., 12/13/10, at 92.)  Plaintiffs knew defendant did not have an agreement of sale for either lot.  Id. at 72-73, 179.

---

[1]    According to the National Penn Loan agreement, conditions for the advance of the National Penn Loan included Mingdesty establishing with the lender a cash collateral deposit account in the amount of $410,000 and an interest reserve fund in the amount of $470,000.  (Ex. P-8 ¶¶ 5(g) and (h).)  Additionally, defendant sought repayment of expended costs in the amount of $210,000 to $212,000.  The aggregate of these amounts is approximately $1,100,000, the amount borrowed from plaintiffs.

[2]    Tim Dillon, at all times relevant hereto, was a consultant/advisor to ACP.  Mr. Cocoziello requested Mr. Dillon to provide consulting advice with respect to the Property.

While at the Property, defendant stated that he had completed the work necessary for the subdivision approvals, but that he needed to close on the sale to finish the subdivision requirements. Id. at 179, 202-03. "Site plan maps" of an engineering nature and "rough plans," were made available during the tour. Id. at 20, 49, 88. See also N.T., 12/14/10, at 160. During the tour, defendant showed plaintiffs the location of the retention basins on both lots. Id. At the time the individuals toured the Property, other than a "crude road," no visible improvements were made to the Property. (N.T., 12/13/10, at 90, 141-42.) No work had been done to construct storm water run-off and/or retention basins, or other improvements to the Property.

After touring the Property, the individuals went to lunch and discussed the purchase of the Property by Mingdesty. Mingdesty would purchase the Property financed by personal loans from both plaintiffs secured by a pledge of Mingdesty stock and the National Penn Loan secured by a mortgage on the Property. The lunch lasted between thirty and ninety minutes. (N.T., 12/13/10, at 23-24.) Plaintiffs considered extending the loans and Mr. Cocoziello asked defendant to forward documents to Mr. Dillon for review. Mr. Cocoziello relied upon Mr. Dillon to perform the due diligence in connection with the transaction. Id. at 48-49, 58-59, 68, 193. Ms. Price did not request documents regarding the purchase of the Property and relied upon ACP's decision. Id. at 210. ACP also relied upon National Penn to have completed due diligence regarding the transaction. Id. at 67-68, 145. Prior to the closing, Mr. Dillon reviewed National Penn's mortgage commitment letter. Id. at 144-45. The National Penn mortgage commitment letter addressed the assignment agreement pursuant to which Mingdesty, the borrower, was obligated to pay the Former Partners the sum of $140,000. (Ex. P-41 ¶ 30.)

Plaintiffs' loans were to be gap financing.  These loans would allow defendant to close on the Property and quickly complete the sale of the fourteen acre lot.  While the parties intended or hoped that plaintiffs would be repaid quickly from the sale of the smaller lot, plaintiffs knew defendant did not have an agreement of sale for either lot.  (N.T., 12/13/10, at 72-73, 137-38.)  Mr. Cocoziello testified that he thought the loan could be outstanding for "a year, two years."  Id. at 26.

A representative from National Penn attended the closing on November 1, 2006 (the "Closing").  Plaintiffs did not attend the Closing.  Mingdesty's purchase of the Property was funded by the following sources: (1) the National Penn Loan in the amount of $3.1 million secured by a mortgage on the Property; (2) a loan from Ms. Price in the amount of $400,000 (the "Price Loan") secured by a pledge of Mingdesty stock; and (3) a loan from ACP in the amount of $700,000 (the "ACP Loan" and, with the Price Loan, the "Plaintiffs' Loans") secured by a pledge of Mingdesty stock.  Mr. Dillon hired an attorney to prepare the documents ACP and Price required for the transaction.  (N.T., 12/13/10, at 189.)

On November 1, 2006, defendant and Mingdesty executed and delivered to plaintiffs promissory notes (the "Plaintiffs' Notes") and Stock Pledge and Security Agreements (the "Stock Pledge Agreements").  See Exs. P-10, P-11, P-12 and P-14.  Defendant also delivered unendorsed share certificates for the stock in Mingdesty pledged as security for the Plaintiffs' Loans.  See Exs. P-13 and P-15.

C.     **Defaults and Foreclosure**

In the fall of 2008, defendant ceased paying interest on the National Penn Loan. In October 2008, defendant asked Ms. Price for an additional loan of monies in order to pay an

interest payment on the National Penn Loan.  Defendant executed a promissory note payable to

Ms. Price in the amount of $10,300 to be paid back by December 15, 2008 from a commission

defendant was expecting from the sale of another property (the "Second Price Loan").  (Ex. P-

28.)  Defendant never repaid any portion of the Second Price Loan.  (N.T., 12/13/10, at 199-200.)

By letter dated December 10, 2008, National Penn notified plaintiffs that Mingdesty was in

default of the National Penn Loan.  (Ex. P-30.)

        Mingdesty's default under the mortgage constituted a default under the terms of

the Plaintiffs' Loans.  Plaintiffs exercised their rights under the Stock Pledge Agreements and

took control of Mingdesty.  (Exs. P-25 to P-27.)  Mingdesty, under control of plaintiffs, did not

cure the National Penn Loan default.  National Penn foreclosed on the Property.  ACP entered

into an Assignment of Sheriff's Bid with National Penn, and ACP purchased the Property for

$2.0 million.  (Ex. P-35.)

    **D.    Nondisclosures/ Misrepresentations**

        Plaintiffs identify three categories of nondisclosures or misrepresentations in this

case.[3]  (Pls.' Prop. Findings of Fact at 23-24.)  The first category concerned the status of the

subdivision process.  The second were misrepresentations regarding amounts defendant agreed to

pay the Former Partners.  The third category involved amounts defendant owed to Ms. Ryan.  Id.

During his closing argument, plaintiffs' counsel identified a fourth category of misrepresentation,

---

        [3]        During the trial, evidence was introduced indicating that defendant may, or may
not, have misrepresented himself as an architect and as having attended college, and may have
overstated his participation in constructing homes showcased on a promotional DVD.  See N.T.,
12/14/10, at 64-65, 68-70, 190-91.  Other than as potential impeachment evidence, these alleged
misrepresentations are not at issue herein, since plaintiffs did not rely on these alleged
misrepresentations prior to the Closing.

namely, defendant misrepresented that he had buyers for the fourteen acre lot.  (N.T., 2/23/11, at 8.)

### 1.      Amounts Owed to Ms. Ryan

Defendant intentionally failed to disclose to plaintiffs prior to the Closing that additional monies in the amount of $100,000 were owed to Ms. Ryan upon the sale of the two lots: $50,000 from the "construction profit of each lot" to be paid at occupancy.  (Ex. P-5; N.T., 12/13/10, at 35-36.)  Defendant did not provide a copy of Exhibit P-5 to plaintiffs prior to the Closing.[4]  Defendant's obligation to make these payments decreased the value of the Property after sale, and thereby decreased the value of the Mingdesty stock pledged to secure the Plaintiffs' Loans.  This non-disclosure was material to plaintiffs.  Plaintiffs would not have made the loans had they known of this outstanding obligation.  Defendant's failure to disclose this obligation to plaintiffs prevented plaintiffs from making an investigation regarding whether this obligation rendered the transaction financially unsound, which they otherwise would have made, and plaintiffs suffered damages as a result thereof.

### 2.      Final Subdivision Approval

Plaintiffs assert that defendant failed to disclose the true status of the final subdivision approval for the Property and that additional costs in the aggregate amount of $149,600 would have to be paid for construction of storm water management and other necessary improvements.  Exhibit P-6 states as follows:

---

[4]      Exhibit P-5 is an Addendum to Agreement of Sale between Ms. Ryan and defendant, dated October 2, 2006, attached to the Agreement of Sale between those individuals and the Former Partners dated October 8, 2004.

> This is to certify that the Ryan property located in Upper Makefield
> Township, Bucks County, Pennsylvania has received final subdivision approval
> from the Upper Makefield Township Board of Supervisors to be divided into two
> (2) residential building parcels.

(Exhibit P-6.) Defendant accurately stated that the Property received final subdivision approval.

Defendant explained that site improvements needed to be constructed on the Property, such as

storm water run-off and retention basins. (N.T., 12/14/10, at 160.) Defendant testified that

during the tour of the Property, he had "full sized engineering plans showing topography and plot

lines and building envelopes," and that he showed the individuals on the tour the location of the

retention basins on both lots. Id. Mr. Cocoziello and Mr. Dillon admitted that they saw maps or

plans of an engineering nature during the tour. (N.T., 12/13/10, at 20, 49, 88.) At the time the

individuals toured the Property, no work had been done to construct storm water run-off and/or

retention basins, or other improvements to the Property. Mr. Cocoziello testified that he had

more than thirty years experience in the acquisition and development of real property and that he

was "very" familiar with the subdivision process. (N.T., 12/13/10, at 10-11.) Mr. Cocoziello

further testified that the development process requires a "retention pond to be constructed so that

. . . storm water management is maintained on the site." Id. at 53. Upon consideration of all of

the testimony, it was clear that Mr. Cocoziello and Mr. Dillon knew that improvements to the

Property were needed but had yet to be constructed.[5] See N.T., 12/14/10, at 160-62. This court

---

[5]     Mr. Cocoziello, a plaintiff, and Mr. Dillon admitted to viewing certain maps or
plans of an engineering nature while touring the Property. They also admit to receiving Exhibit
P-9 prior to the Closing. On page 4 of Exhibit P-9, defendant stated that Final Subdivision and
Land Development Plans were "available for review." See Ex. P-9 at 4. It is unclear whether
plaintiffs accepted this invitation and requested the final plans. As plaintiffs admit in their
Proposed Findings of Fact and Conclusions of Law, Mr. Cocoziello "did not suggest any
particular documents that should be reviewed prior to closing on the loan." (Pls.' Prop. Findings
of Fact and Concl. of Law at 14.) The court notes that this case is laden with accusations by

finds that defendant did not conceal from plaintiffs the true status of the subdivision approval for

the Property.

### 3.    Payments to the Former Partners

Plaintiffs also contend that defendant failed to disclose Mingdesty's obligations to

make payments to the Former Partners.  As discussed above, Ms. Price relied upon ACP's

decision as to whether to become involved in the purchase of the Property.  ACP relied upon Mr.

Dillon to do the appropriate due diligence.  Mr. Dillon reviewed documents and also relied upon

National Penn's due diligence and willingness to make the loan.  Mr. Dillon testified that, as part

of his due diligence, he reviewed a mortgage term sheet and the National Penn commitment

letter.  (N.T., 12/13/10, at 144-45.)  Ex. P-41 is the National Penn commitment letter.  At

paragraph 30 thereof, National Penn addresses the payments owed by Mingdesty to the Former

Partners.  (Ex. P-41.)  While Mr. Dillon did not specifically state that he saw Exhibit P-41, he did

testify that he saw a mortgage term sheet and a commitment letter.  Dillon saw and reviewed

Exhibit P-41.[6]  Defendant did not conceal from plaintiffs the obligations to the Former Partners.

---

plaintiffs and Mr. Dillon that certain documents were requested but not provided.  Yet, in spite of
this alleged deficiency, Mr. Cocoziello, an individual with more than thirty years experience in
the acquisition and development of real property, proceeded to make the ACP Loan.

[6]     In finding that Mr. Dillon reviewed the National Penn commitment letter, Exhibit
P-41, the court relied upon Mr. Dillon's testimony in that regard.  The court also notes that
during closing arguments, plaintiffs' counsel, in response to statements by defense counsel that
Mr. Dillon reviewed Exhibit P-41, did not deny that Mr. Dillon saw this document.  Rather,
plaintiffs' counsel attempted to downplay the contents of Exhibit P-41 stating as follows:

> But if you look at the commitment letter, it does not really apprise you of much
> when you look at it.  Primarily what the plaintiffs were relying on was that he had
> a commitment.  Like the first page, the numbers, you know they look at the bank –
> the total loan amount 3.1 million.  And a bank was willing to do this.  I think in
> Dillon's words, he said that was important, you know, or that was a positive thing.

### 4.     Prospective Buyer for Fourteen Acre Lot

Last, plaintiffs contend that defendant misrepresented that he had serious buyers for the fourteen acre lot and that there was sufficient interest in the larger lot that both lots should be sold within a six month period of time.  Plaintiffs' counsel admitted during closing arguments that the buyers interested in the lot were not a "phantom couple" – they did exist.  (N.T., 2/23/11, at 10.)  However, counsel argued that defendant's misrepresentations were regarding how imminent the sale was, and in which lot the buyers were interested.  Id.  Plaintiffs contend that defendant made these misrepresentations in order to fraudulently induce plaintiffs to make the Plaintiffs' Loans.  The court finds that defendant represented that he had prospective buyers interested in the fourteen acre lot.  Defendant further explained that he wanted to proceed quickly to the Closing so that he did not lose the prospective buyers.  Plaintiffs knew that defendant did not have an agreement of sale for either lot.  Plaintiffs knew that defendant could not sell property he did not own.  Also, while plaintiffs and defendant hoped that the lots would be sold and that the Plaintiffs would be repaid quickly, Mr. Cocoziello testified that he thought the Plaintiffs' Loans could be outstanding for one to two years.  Defendant did not misrepresent that he had serious buyers for the fourteen acre lot or that the two lots would be sold quickly so that Plaintiffs would be repaid in a set period of time.

---

· ·

(N.T., 2/23/11, at 88.)  However, the National Penn commitment letter clearly stated at paragraph 30 that monies in the amount of $140,000 were owing to the Former Partners.  Plaintiffs cannot complain that defendant failed to produce documents pertaining to his obligations to the Former Partners, when plaintiffs already had the documents in their possession, which would have informed them of the obligations had they carefully reviewed the entire document.

## II.     CONCLUSIONS OF LAW

The parties do not dispute that this court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332, and this action may be brought in this district pursuant to 28 U.S.C. § 1391(a).  (Complaint ¶¶ 4, 5; Answer ¶¶ 4, 5.)  The parties acknowledge that this is a case involving claims of fraud.  Plaintiffs have asserted claims for breach of contract and breach of implied covenant of good faith and fair dealing (Count I), fraudulent inducement (Count II)[7], fraudulent concealment/non-disclosure (Count III)[8], breach of fiduciary duty (Count IV), and negligent misrepresentation (Count V).

### A.     Count I - Breach of Contract and Breach of Implied Covenant of Good Faith and Fair Dealing; Count II – Fraudulent Inducement; and Count III - Fraudulent Concealment/ Non-Disclosure

In Count I of the Complaint, plaintiffs assert a claim for breach of contract with respect to the Price Loan in the amount of $400,000 and the ACP Loan in the amount of $700,000.[9]  The court notes that plaintiffs do not suggest any proposed conclusions of law

---

[7]     Plaintiffs' counsel stated that the fraudulent misrepresentation made by defendant under Count II is the representation that he had a serious buyer for one of the parcels of the Property.  (N.T., 2/23/11, at 17.)

[8]     The fraudulent concealment claim in Count III of the Complaint addresses plaintiffs' assertions that defendant failed to disclose: (1) the true status of the subdivision approvals and that an additional $149,600 would be required to complete the subdivision requirements; (2) the $100,000 owed to Ms. Ryan; and (3) the $140,000 (or $150,000) owed to the Former Partners.  (N.T., 2/23/11, at 22.)

[9]     At the closing arguments presented on February 23, 2011, plaintiffs moved to amend the pleadings to conform to the evidence.  They sought to amend Count I of the Complaint to include a claim on behalf of plaintiff Ms. Price for repayment of the Second Price Loan, plus interest, signed by defendant in November of 2008 (Ex. P-28).  (N.T., 2/23/11, at 3.)  Plaintiffs contend that defendant affirmed the obligation, and his intention to repay it, during his testimony and, therefore, it was "tried by implied consent."  Id. at 3-4.  While defendant did not object during the direct testimony of Ms. Price, see N.T., 12/13/10, at 198-01, or the cross-

regarding Count I of the Complaint, rather, their proposed conclusions of law begin with Count II

of the Complaint.  See Pls.' Prop. Concl. of Law at 34.  Defendant references Count I in his

Proposed Conclusions of Law.  See Def.'s Prop. Concl. of Law at 14.  At closing argument,

_____

examination testimony of defendant, see N.T., 12/14/10, at 52-54, regarding the Second Price Loan during the trial, counsel did object to plaintiffs' motion to amend the pleadings stating that the claim regarding the Second Price Loan is a separate action involving two of the three parties. Defense counsel also argued that had he "known that this issue was going to come up, I possibly would have presented a different defense than I did.  I was precluded from even preparing a defense to it."  (N.T., 2/23/11, at 4-5.)  Fed. R. Civ. P. 15(b)(2) permits amendment of the pleadings both during and after trial for issues tried by express or implied consent.  There is no express consent from defendant to the amendment of Count I of the Complaint to add a breach of contract claim on Ms. Price's behalf with respect to repayment of the Second Price Loan.  The court must assess whether there was implied consent to amend the claim.  Factors to consider in determining whether an issue was tried by implied consent include: "whether the parties recognized that the unpleaded issue entered the case at trial, whether the evidence that supports the unpleaded issue was introduced at trial without objection, and whether a finding of trial by [implied] consent prejudiced the opposing party's opportunity to respond."  Douglas v. Owens, 50 F.3d 1226, 1236 (3d Cir. 1995) (quoting Portis v. First Nat'l Bank, 34 F.3d 325, 332 (5th Cir. 1994)).  The Third Circuit Court of Appeals also has instructed that "[t]he primary consideration in determining whether leave to amend under Fed. R. Civ. P. 15(b) should be granted is prejudice to the opposing party."  Evans Prods. Co. v. West Am. Ins. Co., 736 F.3d 920, 924 (3d Cir. 1984) (citation omitted).

Here, defense counsel did not object to any of the testimony regarding the Second Price Loan, including deposition designations by defendant in which he admitted entering into the Second Price Loan and defendant's testimony that "[g]iven the opportunity cash flow wise, yes.  My intention is to pay [the Second Price Loan] at some time."  (N.T., 12/14/10, at 53-54.) The note relating to the Second Price Loan was moved into evidence as Exhibit P-28.  Defendant did not object to the admission of Exhibit P-28 into evidence.  During closing argument, defense counsel admitted that Ms. Price "is out" $410,000; this amount includes the Second Price Loan. (N.T., 2/23/11, at 80.)  Defense counsel stated during closing that he possibly may have prepared a different defense had he known the Second Price Loan was part of Count I.  He did not further elaborate and this court cannot imagine what he would have done differently with respect to this loan in the amount of $10,300.  For all these reasons, this court finds that defendant will not suffer prejudice if plaintiffs are granted leave to amend the pleadings to add a breach of contract claim with respect to the Second Price Loan to Count I of the Complaint.  Plaintiffs' motion for leave to amend the pleadings is granted pursuant to Fed. R. Civ. P. 15(b)(2).  Additionally, the court finds in favor of plaintiff Price and against defendant with respect to the Second Price Loan and judgment will be entered in favor of plaintiff Price in the amount of $10,300.

counsel for plaintiffs reiterated that this is a fraud case.  (N.T., 2/23/11, at 2.)  See also Joint

Pretrial Memorandum at 1 ("Essentially, this is a fraud case.  Plaintiffs' [sic] allege that

[defendant] fraudulently induced [plaintiffs] to loan a combined $1,100,000 to enable

[defendant]" to purchase the Property.).  In their proposed conclusions of law, plaintiffs

acknowledge that their damages are those permitted in a fraud action.  See Pls.' Prop. Concl. of

Law at 38-41.

        The court declines to provide relief under Count I, which alleges a contractual

breach of the implied covenant of good faith and fair dealing.  (Complaint ¶¶ 44-51.)  Plaintiffs

do not address this claim in their Proposed Findings of Fact and Conclusions of Law.  Plaintiffs'

inattentiveness to Count I of the Complaint is understandable.  While generally "Pennsylvania

courts have adopted the principle embodied in Section 205 of the Restatement (Second) of

Contracts, namely, that every contract imposes on each party a duty good faith and fair dealing in

its performance and enforcement," the law in Pennsylvania on whether such a duty is implied in

a contract between a lender and a borrower is unclear.  Lorah v. Suntrust Mortgage, Inc., 2010

WL 5342738, at *5, *5 n.4 (E.D. Pa. Dec. 17, 2010).  No court in Pennsylvania has found that a

contract between a borrower and a lender contains an implied duty of good faith and fair dealing

that a borrower must exercise toward the lender.  While there are cases where, under limited

circumstances, the court may impose such a duty on a lender, such is not the situation in the facts

before this court.  See Ross v. Canada Life Assurance Co., 1996 WL 182561, at *8 (E.D. Pa.

Apr. 16, 1996).  The court declines to impose such an implicit duty on a borrower when no

Pennsylvania court has imposed such a duty, and where plaintiffs have not pursued the claim in

their Proposed Findings of Fact and Conclusions of Law.  Therefore, the court will not find that

plaintiffs are entitled to relief under Count I of the Complaint.  Instead, the court will focus on

Counts II through V of the Complaint.

In Count II of the Complaint, plaintiffs state a claim for fraudulent inducement.

Under Pennsylvania law, fraudulent inducement may be found where an "opposing party made

false representations that induced the complaining party to agree to the contract."  Toy v.

Metropolitan Life Ins. Co., 928 A.2d 186, 205 (Pa. 2007) (quotation omitted).  A fraudulent

inducement/misrepresentation claim has six elements under Pennsylvania law:

> (1) a representation; (2) which is material to the transaction at hand; (3) made
> falsely, with knowledge of its falsity or recklessness as to whether it is true or
> false; (4) with the intent of misleading another into relying on it; (5) justifiable
> reliance on the misrepresentation; and (6) the resulting injury was proximately
> caused by the reliance.

Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 771 (3d Cir. 2009) (quoting Overall v. Univ. of

Pa., 412 F.3d 492, 498 (3d Cir. 2005) (quoting Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994))).

Evidence of fraud must be clear, precise and convincing.  See Fort Washington Resources, Inc. v.

Tannen, 858 F. Supp. 455, 459 (E.D. Pa. 1994) ("[F]raud must be proved by a higher evidentiary

standard; the party alleging fraud has the burden of proving it by clear, precise and convincing

evidence.") (citations omitted).  See also Kaufman v. Mellon Nat'l Bank and Trust Co., 366 F.2d

326,330 (3d Cir. 1966) (burden upon plaintiffs in fraud claim to "prove the fraud by evidence

that was 'clear, precise and indubitable'") (quoting Highmont Music Corp. v. J.M. Hoffmann

Co., 155 A.2d 363 (Pa. 1959)); Temp-Way Corp. v. Continental Bank, 139 B.R. 299, 322 (E.D.

Pa. 1992) (Bechtle, J.) (same).

To establish a claim of fraudulent concealment under Pennsylvania law, plaintiffs

must show that defendant: "(1) made a knowingly false representation of fact; (2) intentionally

concealed true facts with the purpose of deceiving the plaintiff; or (3) intentionally failed to disclose non-privileged material facts to the plaintiff." Singleton v. Medearis, 2009 WL 3497773, at *2 (E.D. Pa. Oct. 28, 2009) (Joyner, J.).  The fraudulent concealment must be "intentional and material." Id.  "A 'material' misrepresentation or concealment is of such character that had it not been made, the transaction would not have incurred." Id.  A defendant is liable "only if the defendant prevents the plaintiff from making an investigation he or she would have otherwise made." Id.

In order to prove their claim of fraudulent inducement, plaintiffs must introduce parol evidence.  Defendant asserts that such evidence is not admissible to alter the terms of the written documents in this case.  Plaintiffs contend that parol evidence is admissible under a fraud exception to the parol evidence rule recognized by Pennsylvania law.  Generally stated, the parol evidence rule as applied in Pennsylvania declares that where "'the parties, without fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only evidence of their agreements[;]'" that "'[a]ll preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract[;]'"and that "'unless fraud, accident, or mistake be averred, the writing constitutes the agreement between the parties, and its terms cannot be added to nor subtracted from by parol evidence.'" Toy, 928 A.2d at 204 (quoting Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 436 (Pa. 2004) (quoting Gianni v. Russell Co., 126 A. 791, 792 (Pa. 1924))).  There is a fraud exception to the parol evidence rule.  The Supreme Court of Pennsylvania has restricted the exception to allegations of fraud in the execution of a contract, and has refused to apply the exception to allegations of fraud in the inducement of a contract. Id. at 204-05 (quoting Yucca,

854 A.2d at 437).  The limitation of this exception does not mean that plaintiffs cannot introduce

parol evidence in support of their claim of fraudulent inducement.  Before doing so, however,

plaintiffs must establish the parol evidence rule does not apply.  In order for the parol evidence

rule to apply,

> there must be a writing that represents the parties' entire contract, and that
> whether there exists such a writing is determined by assessing whether the writing
> appears to be a contract complete in itself, importing a complete legal obligation
> without any uncertainty as to the object or extent of the parties' engagement.
> [Yucca, 854 A.2d at 436.]  We also noted that an integration clause that states that
> the writing is meant to represent the parties' entire agreement is a clear sign that
> the writing is meant to be just that, and thereby expresses all the parties'
> negotiations, conversations, and agreements made prior to its execution.  Id.

Toy, 928 A.2d at 204.  In Price v. Elexco Land Servs., Inc., 2009 WL 2045135, at *3 (M.D. Pa.

July 9, 2009), defendants argued that Toy holds that a fraudulent inducement claim cannot be

supported by parol evidence.  The court concluded that such a reading of Toy is "too broad[],"

and that a fraudulent inducement claim can be supported by parol evidence if the underlying

contract is not fully integrated.

Here, the question is whether the contracts at issue are fully integrated and,

therefore, the parol evidence rule applies to bar plaintiffs' fraud claims.  The controlling

documents herein are: (1) Stock Pledge and Security Agreement dated November 1, 2006

between Advance Capital, defendant and Mingdesty, Inc. (Ex. P-12); (2) Stock Pledge and

Security Agreement dated November 1, 2006 between Ms. Price, defendant and Mingdesty (Ex.

P-14); (3) Promissory Note dated November 1, 2006 in the amount of $700,000 payable to

Advance Capital and executed by defendant as president of Mingdesty (Ex. P-10); and (4)

Promissory Note dated November 1, 2006 in the amount of $400,000 payable to Ms. Price and

executed by defendant as president of Mingdesty (Ex. P-11).  Neither the Stock Pledge Agreements nor the Promissory Notes contain integration clauses.  The absence of an integration clause is evidence that the agreements are not the entire contracts between the parties.  A lack of an integration clause, however, is not necessarily dispositive of the issue.  See Paxson v. Asenio, 2003 WL 21076984, at *4 (E.D. Pa. May 5, 2003).

Other evidence points to the fact that the agreements are not the entire contract between the parties.  The Stock Pledge Agreements make reference to other documents, namely: the Promissory Notes (Stock Pledge Agreements at 1); certain guaranties by Mingdesty and Rossmann, id.; share certificates and endorsements, id. at 2; and Mortgage Loan Documents, as that term is defined in the Stock Pledge Agreements, id. at 3.  Reference to other documents was required to determine, for example, the events of default under the agreements, and rights with respect to the pledged stock.  The lack of an integration clause and the fact that the agreements refer to other documents are strong evidence that the agreements are not the entire contract between the parties.  Green Valley Dry Cleaners, Inc. v. West-Moreland County Industrial Dev. Corp., 832 A.2d 1143 (Pa. Commw. Ct. 2003).  See Price v. Elexco Land Servs., Inc., 2009 WL 2045135, at *3-5 (M.D. Pa. July 9, 2009) (parol evidence rule does not apply and fraudulent inducement claim will not be dismissed as the court found the lease was not the entire contract between the parties where lease did not have an integration clause and referred to other documents that augmented the lease, and, when considered together, the documents do not reflect the entire agreement).  Since the agreements do not reflect the entire agreement between the relevant parties hereto, the parol evidence rule does not apply and plaintiffs may introduce parol evidence in support of their fraud claims.

17

Plaintiffs assert that defendant made fraudulent statements/omissions in order to induce plaintiffs to make the Plaintiffs' Loans.  Specifically, plaintiffs contend that defendant fraudulently stated that he had buyers for the fourteen acre lot and that there was sufficient interest in the forty-four acre lot that he would be able to sell both parcels and repay the Plaintiffs' Loans within six months (Compl. ¶ 53; Pls.' Prop. Concl. of Law ¶2).  As stated above in the court's Findings of Fact, defendant stated that he had interested buyers for the smaller fourteen acre lot.  Mr. Dillon testified that defendant represented that the smaller lot "had basically been spoken for."  (N.T., 12/13/10, at 91.)  Defendant stated that the prospective buyers had seen the lot and wanted to buy it.  Defendant wanted to close quickly on the purchase of the Property so that he could make the sale.  Id. at 92.  Mr. Cocoziello and Mr. Dillon both knew defendant did not have an agreement of sale for either lot.  Id. at 72-73, 138.  The prospective sale of the fourteen acre lot fell through because one of the purchasers was experiencing a health issue.  Id. at 180.  Defendant's statements regarding potential purchasers for the Property were not misrepresentations and, therefore, do not support plaintiffs' Count II claim of fraudulent inducement.

With respect to Count III, plaintiffs contend that defendant failed to disclose material facts about defendant and Mingdesty's inability to repay the Plaintiffs' Loans and the National Penn Loan due to other nondisclosed obligations incurred by Mingdesty/defendant.  The nondisclosed obligations included $100,000 due to Ms. Ryan upon occupancy of the lots ($50,000 per lot), $149,600 to complete subdivision approval requirements, and $140,000 owed to the Former Partners.

As the court found above, defendant did not disclose to plaintiffs prior to the Closing that additional consideration in the amount of $100,000 was owed to Ms. Ryan upon the sale of the two lots; $50,000 from the sale of each lot due upon occupancy.  Defendant did not provide a copy of Exhibit P-5 to plaintiffs prior to the Closing.  Mingdesty's obligation to make these payments decreased the value of the Mingdesty stock pledged to secure the Plaintiffs' Loans and also placed into question Mingdesty's ability to repay the Plaintiffs' Loans and the National Penn Loan.  These non-disclosures were material to plaintiffs; plaintiffs would not have made the loans had they known of these outstanding obligations.  Defendant was desperate to obtain the Loans as he had significant monies invested in the Property and the project.  Defendant knew or should have known that his representations were false.  Defendant intended plaintiffs to rely on this nondisclosure to induce them to make the Plaintiffs' Loans to Mingdesty.  These facts support plaintiffs' claim for fraudulent concealment with respect to the monies owed to Ms. Ryan.

Also as detailed above, the court found that defendant did in fact disclose to plaintiffs that monies were owed to the Former Partners.  See Exhibit P-41.  Similarly, the court found that defendant did not conceal facts regarding the status of the subdivision approval process for the purpose of deceiving plaintiffs.  Plaintiffs failed to prove that defendant fraudulently concealed the facts regarding these two issues.

## B.    Count IV – Breach of Fiduciary Duty

Plaintiffs do not suggest any proposed findings of fact or conclusions of law with respect to Count IV of the Complaint stating a claim for breach of fiduciary duty; nor did

plaintiffs' counsel address this Count in the closing argument.  This Count, however, remains in

the case.  The requirements to sustain a claim for breach of fiduciary duty are as follows:

> To allege a breach of fiduciary duty, a plaintiff must establish that a
> fiduciary or confidential relationship existed between her and the defendants.
> Harold v. McGann, 406 F. Supp. 2d 562, 571 (E.D. Pa. 2005).  "Although no
> precise formula has been devised to ascertain the existence of a confidential
> relationship, it has been said that such a relationship exists whenever one occupies
> toward another such a position of advisor or counselor as reasonably to inspire
> confidence that he will act in good faith for the other's interest."  Silver v. Silver,
> 421 Pa. 533, 219 A.2d 659, 662 (1966); see also Basile v. H & R Block, Inc., 777
> A.2d 95, 101-02 (Pa. Super. 2001).
>
> In addition to a confidential relationship, a plaintiff must also allege the
> elements of a breach of fiduciary duty:
>
> (1)    That the defendant negligently or intentionally failed to act in good
>        faith and solely for the benefit of plaintiff in all matters for which
>        he or she is employed;
>
> (2)    That the plaintiff suffered injury; and
>
> (3)    The defendant's failure to act solely for the plaintiff's benefit was a
>        real factor bringing about plaintiff's injuries.

Baker v. Family Credit Counseling Corp., 440 F. Supp. 2d 392, 414-15 (E.D. Pa. 2006) (citations

omitted).

In the Complaint, plaintiffs assert that "Plaintiffs reposed trust and confidence in

Rossmann.  Under the circumstances of this case, plaintiffs . . . were justified in believing that

defendant Rossmann would not act in a manner adverse to [plaintiffs'] interests.  Because of this

relationship of trust and confidence, Rossmann owed [plaintiffs] a fiduciary duty to deal with

them truthfully and honorably, and to employ reasonable care to avoid misleading them."

(Complaint ¶¶ 66-67.)

Case law addressing the fiduciary duty between a lender and a borrower generally addresses whether the lender owes a fiduciary duty to a borrower.  In this regard, "Pennsylvania law follows the well recognized principle that a lender is not a fiduciary of the borrower."  Temp-Way Corp. v. Continental Bank, 139 B.R. 299, 318 (E.D. Pa. 1992) (Bechtle, J.) (citations omitted).  Because this "principle stems from the presumption that the relationship between lenders and borrowers is conducted at arms-length and the parties are acting in their own interest," id., a borrower is not a fiduciary of a lender.  A lender may become a fiduciary of a borrower "if the lender gains substantial control over the borrower's business affairs."  Id. (citations omitted).

Plaintiffs have failed to establish that defendant, the borrower, owes a fiduciary duty to plaintiffs, the lenders.  This was an arms length business transaction and plaintiffs acknowledge that they were required to perform their own due diligence in deciding whether to make the loans to defendant.  Judgment will be entered in favor of defendant and against plaintiffs on Count IV of the Complaint.

### C.    Count V – Negligent Misrepresentation

In Bortz v. Noon, 729 A.2d 555, 561 (Pa. 1999), the Supreme Court of Pennsylvania directed that a successful claim for negligent misrepresentation requires proof of: (1) a misrepresentation of a material fact; (2) made under circumstances in which the speaker ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation.  Id.  See also Dinger v. Allfirst Financial, Inc., 82 Fed. Appx. 261, 266 (3d Cir. 2003) (not precedential) (same).  Plaintiffs' burden of proof with respect to Count V is a preponderance of the evidence.

21

Moffatt Enterprises, Inc. v. Borden, Inc., 807 F.2d 1169, 1178 (3d Cir. 1980).  As with plaintiffs'

fraud claims, damages for a successful negligent misrepresentation claim do not include the

benefit of plaintiffs' contract with the defendant.  Damages recoverable for a negligent

misrepresentation claim are to compensate the plaintiff for pecuniary loss of which the

misrepresentation was the legal cause and include the difference between the value of what was

given and what was received plus any other pecuniary loss suffered as a consequence of the

plaintiff's reliance upon the misrepresentation.  Torres v. Borzelleca, 641 F. Supp. 542, 545

(E.D. Pa. 1986).

   Here, the court found that defendant fraudulently concealed the obligations owed

to Ms. Ryan, which diluted the value of the Mingdesty stock pledged to secure the Plaintiffs'

Loans.  In the alternative, the court also finds that defendant negligently misrepresented the true

value of the Mingdesty stock pledged to secure the Plaintiffs' Loans by failing to inform

plaintiffs of the amounts owed to Ms. Ryan.

  **D.**  **Damages**

   **1.**  **The Plaintiffs' Loans**

   The parties agree that, under Pennsylvania law, damages in a fraud action and a

claim for negligent misrepresentation, are limited to the plaintiff's "actual pecuniary loss."

Associated Hardware Supply Co. v. Big Wheel Distributing Co., 355 F.2d 114, 120 (3d Cir.

1965).  See also Joint Pretrial Memorandum at 9 n.4.  Under Pennsylvania law, a victim of fraud

can recover only his actual loss and not the benefit of his bargain.  Motorola, Inc. v. Elec. Lab.

Supply Co., Inc., 1991 WL 12437, at *5 (E.D. Pa. Jan. 31, 1991).  In an action based upon fraud,

the plaintiff "is entitled to recover his actual loss measured by the difference between the price he

paid and the value of that which he received, determined as of the time of the transaction."
Kaufman, 366 F.2d at 331 (citations omitted). "It is clear that under the law of Pennsylvania a
victim of fraud may recover only his actual loss and not the value of his bargain." Id. at 331-32.
See also B&P Holdings I, LLC v. Grand Sasso, Inc., 114 Fed. Appx. 461, 466 (3d Cir. 2004)
("Under Pennsylvania law, in an action based on fraud, the measure of damages is 'actual loss'
and not the benefit, or value, of that bargain.") (quotation omitted) (not precedential).

Plaintiffs are entitled to recover the difference between the price paid
($1,100,000) and the value of that which was received (Mingdesty stock), as determined at the
time of the transaction on November 1, 2006.  Plaintiffs assert that due to defendant's grant of
interests to third party creditors, the value of the Mingdesty stock at the time of the transaction
was close to zero and, therefore, they are entitled to receive an award of damages in the full
amount of the Plaintiffs' Loans – $1,100,000.  (Pls.' Prop. Concl. of Law ¶¶ 6-8.)  While
plaintiffs ultimately lost the full amount of their investments, it does not follow that the stock
rights that they acquired at the time of the transactions were valueless.  Mingdesty's sole asset
was the Property.  Therefore, the value of the Mingdesty stock is equal to the value of the
Property.

Plaintiffs' expert, Matthew Weinstein, testified as an expert in the area of  real
estate law.  (N.T., 12/14/10, at 93.)  Referring to Exhibit P-9, Mr. Weinstein testified that the
market value of the Property on the date the loans were extended was $4,550,000.  Id. at 100-01.
Subtracting the total value of the debt (National Penn Loan of $3,100,000 plus Plaintiffs' Loans

of $1,100,000), would leave an equity cushion of $350,000 on day one of the transaction.[10]  Id. at

101.  Mr. Weinstein continued that the undisclosed obligations against the Property would erode

this equity cushion until the stock had a value of zero.  Id. at 101-06.

      At the time of the transaction, the equity cushion, as calculated in the previous

paragraph, was $350,000.  Subtracting the obligations known by plaintiffs ($140,000 to Former

Partners), the equity cushion is reduced to $210,000.  The only obligation the court found that

defendant fraudulently concealed from plaintiffs was the $50,000 per lot payment due to Ms.

Ryan upon occupancy of the dwellings to be built on the lots, and this $100,000 obligation

survived the sale of the Property.  The equity cushion should be reduced by the $100,000

payments due to Ms. Ryan, leaving a reduced equity cushion of $110,000.  The loss of value in

the Mingdesty stock attributable to the fraudulent non-disclosure of defendant is $100,000.[11]  The

court will enter judgment against defendant and in favor of plaintiff Ms. Price in the amount of

$36,000 and in favor of plaintiff ACP in the amount of $64,000.[12]

---

[10]    Plaintiffs received Exhibit P-9 prior to the Closing and were aware of the market value stated in that documents, as well as the aggregate amount of the debt.

[11]    The value of the Mingdesty stock should not be reduced by the $149,600 cost to complete the storm water and retention basin and other subdivision work on the Property, as the $4,550,000 figure represents the market value of the Property as of November 1, 2006.  Plaintiffs hoped to convince this court that they are entitled to the value of their debt ($1,100,000) less the value of the Mingdesty stock, which they estimate as close to zero, for an award of damages close to the full amount of the Plaintiffs' Loans.  However, plaintiffs knew at the time of the Closing that the value of the Property owned by Mingdesty was not equal to the amount of the Plaintiffs' Loans.  The value of the Mingdesty stock equals the value of the Property, Mingdesty's sole asset.  Plaintiffs were hoping to receive the benefit of quick and profitable sales of the Property, which did not occur.  Plaintiffs are not entitled to the lost benefit of the bargain.

[12]    Ms. Price's share of the Plaintiffs' Loans amounts to thirty-six percent; ACP's share is sixty-four percent.  See supra p. 5.

### 2.        The Second Price Loan

As noted above, <u>infra</u> note 9, the court granted plaintiffs' request to amend Count I of the Complaint to include a breach of contract claim with respect to the Second Price Loan. This is not a fraud claim but a claim for failure to repay the Second Price Loan when due. Judgment will be entered in favor of plaintiff Price and against defendant in the amount of $10,300 for the full amount due and owing under the Second Price Loan.

An appropriate order follows.

BY THE COURT:

/s/  Thomas J. Rueter
THOMAS J. RUETER
United States Magistrate Judge